# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed June 24, 1901.

STATE OF MARYLAND
VS.
JOHN T. GRAY ET AL.

*Edgar H. Gans, Isidor Rayner* and *W. Calvin Chesnut* for plaintiff.

*John N. Steele* and *W. S. Bryan, Jr.,* for defendants.

DENNIS, J.—

The bill in this case is filed against the testamentary trustee of the late John T. Gray, formerly clerk of the Court of Common Pleas of this city, and against his children and grandchildren who were beneficiaries under his will.

The bill alleges that Gray was clerk of the said court from November 10, 1885, until November 13, 1895, that during his incumbency of said office, he, by virtue of his office received large sums of public money, which he deposited and invested, so that they drew large rates of interest amounting in the aggregate to $16,385.49, which Gray received without the knowledge of the State, and failed to account for, or to pay over to the State, and applied the same to his own use.

The bill further alleges that suit has been brought upon the official bonds of the said Gray, executed for his several terms of office, in the Baltimore City Court, which suits are still pending, and that the sureties on said bonds notified and requested the State to proceed against the estate of Mr. Gray. That the Baltimore Trust and Guarantee Company, the executor and trustee under the will of the said Gray, has paid over to the beneficiaries named in the said will the amounts as therein provided, has passed its final administration account, and now holds, as trustee under said will, the sum of $13,113, and that the plaintiff is entitled to look to the said beneficiaries to make good its claim.

To this bill several of the defendants have demurred, and the case stands on this demurrer; in support of which is urged:

I. That equity has no jurisdiction. 1. Because the State has no remedy outside of the bond. 2. Because the banks who paid the interest were necessary parties to the suit, having participated in the breach of trust. 3. Because a complete remedy can be obtained at law in a suit against the executor of Gray.

II. That in view of the lapse of time since the interest was received, and the fact that the State has never

claimed such interest from the public officers until quite recently; it is now barred by laches.

III. That under the Constitution and statutes of the State, it is in no event entitled to claim the interest sued for.

I will consider these defences in their order.

I. (1) The contention that no remedy can be had by the State except in a suit upon the bond is based upon the case of State vs. Stewart, 4 H. & McH. 422, and O'Neill vs. School Commissioners, 27 Md. 240; but, in my opinion, neither of those cases support such a position. In Stewart's case, he was appointed collector to collect certain taxes, which he was to pay over to certain commissioners for the purpose of building a prison in the City of Annapolis; he accepted the position of collector, but did not pay over the taxes, and failed to give bond to the State for the faithful performance of his duty as collector. The State sued, in assumpsit, and the court held that the action could not be supported in the name of the State.

Now, upon the authority of O'Neill's case above referred to, there is no doubt that the commissioners to build the prison could have sued in assumpsit upon the familiar principle that such an action will lie against one who has received money for the use of another, to which the latter is *ex equo et bono* entitled; but what *assumpsit* was there, either express or implied in favor of the State? The money was not collected for it, nor to be paid over to it; so far as the State was concerned, he was in a general way, an unfaithful officer; but having given no bond for the faithful performance of the duties of his office, of course he could not be proceeded against by the State in an action of assumpsit for his dereliction, but only upon a bond whose condition he had forfeited.

Had he collected the money *for* the State—and to be paid over *to* the State—an assumpsit would have been raised in its favor, and upon the principles announced in O'Neill's case, I feel sure the action would have been allowed in the name of the State, although he had failed to give bond.

(2) That the banks should have been made parties defendant.

There is a well settled distinction in equity between necessary parties and proper parties, and I find nothing in the authorities quoted upon this point, or in principle, which requires that in such a case as this the banks are to be considered *necessary* parties. It is too familiar law to need quotation of authorities in its support, that this plaintiff can at his election hold one or more of several joint tort-feasors, and while he might *properly* have included all, it was not *necessary* for him to do so.

Moreover, it does not appear on the face of the bill that the banks knew of the failure of Gray to turn over the interest paid him on the public funds to the State, or that they were either by wilful conduct or negligence, participants in the breach of trust, it is only argumentatively assumed, outside of the allegations of the bill. But in any event, they were not necessary parties, and the plaintiff had the right to proceed against whomever he might select.

(3) That the suit should have been against the executor alone. If the executor had assets in hand sufficient to meet the plaintiff's claim, this might be true; but when, as in this case, he has distributed legacies to certain of the legatees, and the balance in his hands (and it is immaterial whether he holds said balance as executor or trustee), is insufficient to pay in full the claim, the plaintiff is entitled to call upon the distributees to contribute in proportion to the amounts they have severally received to make good the demand.

The bill alleges that the Baltimore Trust and Guarantee Company has now in its hands as trustee only the sum of $13,133, and as the plaintiff's claim is over $16,000, his only complete remedy is in equity. Zolleckoffer vs. Seth, 44 Md. 359. Constable vs. Camp, 87 Md.

II. The defence of laches, even if the bill should in its full circumstances, which in the case of a suit by an individual would amount to a defence by reason of laches (which, however, does not seem to me to be the case in view of the allegations in paragraphs 2 and 11), yet it is well settled law that the State is never bound by the laches of its officers. Wood on Limitations, Section 52, and cases cited.

The only authority adduced by defendants in support of their contentions on this point, was a decision of Judge Brewer in United States vs. McElroy, 28 Fed. Rep. 184, which decision was

reversed when appealed to the Supreme Court, and the universally held doctrine that laches was not pleadable against the State was repeated. U. S. vs. Jusley, 130 U. S. 263. In this connection, let us consider another proposition advanced by the defence, viz: That the custom of allowing clerks of courts to receive and retain interest on their deposit of public funds, and the fact that the State has never claimed a right to it until quite recently, constitute such contemporaneous and continuous interpretation of the statute law of Maryland applicable to clerks of courts by the authorities of the State, that the State is bound by this construction of the law by its own officers, and hence is not entitled now to collect interest received by its officers on deposit of public money.

In the first place, there is nothing whatever on the face of the bill to show that any such custom ever prevailed, or if it did, that it was generally known. I am asked in argument to take notice if it is a matter of public notoriety. There was no such notoriety as to justify the court in taking judicial cognizance of it; on the contrary, while suspicious that such was the practice that may have existed with many, I do not believe that the people of the State generally knew of the existence of the practice.

But assuming that the practice did prevail, it is hard to see how the State should be bound by the construction of the law by public officers having no judicial function, made in their own interest and against the State, even if the accounting officers neglected to demand this interest, when they knew it had been received, or failed to investigate, if they had reasonable ground to believe it had been received. If it could be shown that the Legislature, with full knowledge of the practice, had by some legislation recognized it, that would be a legislative interpretation of the law which the courts would respect; but that public officers can be permitted to make an interpretation of the law in their own favor, and that the State shall be bound thereby and debarred from claiming what belongs to it by reason of that interpretation, is a doctrine wholly unsustained by authority, and too dangerous on grounds of public policy to be tolerated.

In the language of the Supreme Court of Wisconsin, (State vs. Fetridge, 20 L. R. A. 240), where the same defense was urged, "moreover, if every citizen and officer of the State knew that the practice prevailed, it would be difficult to show that a usage which takes from the State, and gives to one of its officers, without authority of law, large sums of money belonging to the State, could be upheld as a valid custom."

But, after all, this theory that the law is to be construed according to the practice of the public official concerned is nothing more, in its ultimate analysis, than the same doctrine of laches, which has already been considered. It is an attempt to set up the misinterpretation of the law by public officials as a bar to the recovery by the State against the same officials who make the misinterpretation of what is due it under a correct interpretation—a more obnoxious form of the doctrine of laches than that presented at an earlier stage of the argument. However it might be as to third parties, who had acted upon such interpretations by State officials (and I do not think the theory would avail even as against them), yet certainly, as against these officials themselves, no such theory of "construction by practice" can be supported, no matter how long the practice based upon such misinterpretation may have continued.

III. Does the interest received by the clerk, upon the monies received by him as clerk, and deposited, belong to the State, or can he claim it as his own? This is the substantial point in the case, and to determine it we have to look to the Constitution of the State and the statutes relating to the question.

Article 3, Section 45, of the Constitution provides that the clerks of the courts in Baltimore City shall not receive over $3,500 a year, over and above all office expenses and compensation to assistants.

Article 15, Section 1, provides that every person holding any appointment under any court of this State, whose pay or compensation is derived from fees or monies coming into his hands for the discharge of his official duties, or in any way connected with or growing out of his office, shall keep a book in which said sums shall be entered, etc., "and each of said officers, where

the sum received by him for the year shall exceed the sum which he is by law entitled to retain as his salary or compensation for the discharge of his duties and the expenses of his office, shall yearly pay over to the Treasurer of the State the amount of such excess;" * * * and "no person holding any office created by or existing under the Constitution of this State shall receive more than $3,000 a year as a compensation for the discharge of his official duties, except in cases especially provided in this Constitution."

Article 4, Section 37, specially provides that the salary of the clerks of the courts in Baltimore City shall be $3,500 each, "and they *shall be entitled to no other perquisites or compensation.*"

In addition to the aforegoing constitutional, there are the following statutory provisions.

Code, P. G. L., Article 17, Section 7, provides that the clerk shall, semi-annually in each year, transmit to the comptroller, a list under oath of *all public money* received by him, which list shall show by whom and on what account public money has been received.

Code, P. G. L., Article 17, Section 8, provides that on the first Monday in March, June, September and December, in every year, each clerk "shall pay to the Treasurer *all public* money which he may have received," etc.

Code, P. G. L., Article 17, Section 9, provides that "for receiving and paying over *all public* money received for licenses, fines *or otherwise,* the several clerks, etc., shall receive 5 per cent.," etc.

Code, P. G. L., Article 17, Section 12, provides that "every clerk * * * shall *annually return to the Comptroller* a *full* and accurate *account* of all his *fees, emoluments* and receipts, whether *on his own account as such clerk,* or for the city, State or county"—including fees for licenses, etc., and also a list of clerks employed by him, etc.

Code, P. G. L., Article 17, Section 14, provides: "The official bond of the clerk shall be answerable for the *emoluments* of his office, over and above the sum prescribed by the Constitution, and he shall also, upon a failure or neglect to pay or account for the excess over and above said sum, to be subjected to a fine not exceeding

$1,000." From these provisions it seems to be clear:

1st. That under no circumstances was the clerk of any of the courts of Baltimore City to receive more than $3,500 per year, no matter whether the sum collected by him was derived from fees, *emoluments or otherwise.*

2nd. That all over and above that sum he is required to account for and pay over to the State.

3rd. That the money collected by him from fees, emoluments or otherwise, is *public money,* and must be accounted for as such, and if public money, then the interest received from its deposit is also public money, because the interest *follows the fund and belongs to* the owner of the fund, as naturally and necessarily as the wool that is annually grown on, and sheared from a sheep's back, belongs to the owner of the sheep.

Mr. Gray was clerk for ten years, during which time he received by way of interest upon these deposits of public money collected by him by virtue of his office the sum of $16,385.49, and if he is entitled to claim this as his own, he will have received each year the sum of $1,638 in addition to his proper salary of $3,500 for which he has already been allowed, which would make his compensation annually $5,138 instead of $3,500 to which the Constitution limits it.

The contention of the defense is, on the contrary, that the money collected by the clerk (and consequently the interest derived from it) was not money belonging to the State; that when the clerk gave his official bond conditioned to faithfully perform the duties of his office and to account for and pay over what was due to the State, the relation of debtor and creditor—*and no other* was established between them; that the clerk became at once the absolute "owner of the moneys collected by him, from the time of their collection to the time when he paid them over to the State Treasurer," that he was at liberty to use it as he pleased, and was guilty of no breach of trust by employing it as his own (defendant's brief, page 20), and, therefore, whatever profit he derived from its use, whether by deposit or otherwise, belonged to him exclusively, and no one could hold him to account.

The cases upon this point are numerous and most conflicting: we have ex-

amined them carefully and have had the benefit of a very thorough analysis and learned comment upon them by the able counsel who argued the case for the State and the defendants, and, whilst it is not possible, and would not be profitable, to review them within the limits of a *nisi prius* opinion, I think the general result may be stated as follows:

A majority of the cases hold that, the execution by a public officer of an official bond establishes the relation of debtor and creditor between him, and the State, that he becomes an *insurer* of the return of the money to the State, and they rest this conclusion, in some of the cases upon the grounds of public policy (in order to avoid collusion, etc.), in some upon the express obligation of the bond from which the obligor can only be relieved by act of God or a public enemy. (U. S. vs. Thomas, 3 Wall 337), and in others upon both grounds. In the cases so holding, whenever the precise point we are now considering in the present case has arisen, it is generally held that the interest upon deposits of public funds belongs to the officer, and cannot be held to account therefor.

There are numerous other cases holding the contrary doctrine, and in those cases interest on the public deposits is held to belong to the State.

In both classes of cases, public statutes, where they have reference to the subject matter, are often found to be the basis for the decision, and it may be stated absolutely, that in one of the cases where the doctrine of insurer is held and that the interest on the deposits belongs to the officer, do the public statutes show that a contrary result was intended; in other words, the intention of the statutes, if it can be gathered from them, must prevail over any general proposition of law which would otherwise be applicable. And therefore, I am of the opinion, by reason of the clear and unmistakable intent shown by the constitutional and statutory provisions already quoted relating to the using public money received by the clerks, that no matter what general rule might be held in this State upon the relation of the officers to the State by reason of an official bond in the absence of statutory regulations no such rule can be applied to defeat that intent; that all such money

remains *public* money, and must be accounted for as such, and all interest earned thereon follows the fund and partakes of its character. But even if the meaning of these provisions were not so clear as it seems to me to be, and should the doctrine that the relation of debtor and creditor exist between the State and a public officer by reason of his official bond, and that he is an *insurer*, and bound to account for the money absolutely, save only in the case of loss by act of God or the public enemy, be held by our Court of Appeals (the holding of which doctrine I cannot help regarding as doubtful). in view of the conclusive overthrow (in my judgment) of the reasons upon which it is based in the dissenting opinion of Justice Miller, (concurred in by Justices Strong and Swayne, in U. S. vs. Thomas, 15 Wall 337, and the numerous cases which take the same view), still I do not see how necessarily or even logically the corollary to that doctrine which the courts hold it deduce, viz.: that *therefore* the money belongs to the officer as his own, and the State's title has wholly gone, follows.

I can see no reason why he cannot be made an *insurer* for the return of the fund, and at the same time the fund retain its trust character. The State may, on grounds of public policy, well require an officer to bind himself for the absolute return of public money, and fortify this requirement by imposing the necessity of providing sureties for its faithful execution, without losing the right to treat the fund as having a *quasi* trust character. That the fund in this case was of a trust character would seem clear, under the decision in State vs. Nicholson, 67 Md.

In that case a collector of taxes was indicted for failure to pay over taxes collected by him, and the court held that money so collected was "money received and held *in trust* for the State." And in U. S. vs. Mosby, 133 U. S. p. 286, speaking of interest received by Col. Mosby, who had been U. S. consul at Hong Kong, upon public moneys deposited with certain banks, the Court said:

The moneys are stated to be "public moneys" in respect to which the consul was a *trustee*, and any interest which he received on the funds belonged to the United States. He was not re-

quired to put the funds out at interest, but if he did so, the accretion belong to the government. Now, in the case at bar, the money in the first instance was due as public money by the parties who paid it just as much as the taxes due the collector in the Nicholson case were public money; the clerk was the agent of the State to collect it, when collected he was required to keep an account of it as public money, and he was required to account for it to the accounting officers as public money; from the beginning to the end, the State's equitable title to the fund seems to be carefully preserved. And even if the provisions preserving the character of the fund *after* its reception by the officer had been omitted, it is hard to understand the mysterious process of transmutation by which the equitable title of the State to a fund which originally was due to the State, and was collected by its agent for its account, at once became converted into the absolute property, with complete legal and equitable title of that agent the moment it came into his hands. I do not see how, upon legal principles that result is necessarily or logically the consequence of his being required to give an official bond, even if that fact be construed as making him an insurer of the fund, and I submit, as the true rule, that the State can proceed on the bond, and it can at the same time look to and pursue the fund, as a quasi trust fund, unless something more than the mere execution of the bond has transpired to destroy its trust character. Let me advert to another consideration, based upon grounds of public policy, why the courts should be slow to adopt the contention of counsel for the defendants unless forced to the conclusion by the inexorable rules of law. If it is established that public monies collected by a public officer belong absolutely to such officer, that, in the language of the defendants' brief, he "can do what he pleases with them," the door is at once opened, and temptations of dangerous import suggested. Regarding the monies as his own and having control of it but a short time, instead of pursuing the conservative course of depositing it and receiving the small interest a bank will allow, he will be tempted to speculation and exposed to the disasters that too often follow a construction that holds out to public officials encouragement to use public funds after this manner, ought not to be favored.

Let me say in conclusion that neither in the result arrived at, nor in anything said in this opinion, do I mean to reflect in the slightest degree upon the character of Mr. Gray, nor of the accounting officers with whom he dealt. In view of what was conceded in the argument to have been the common practice of public officers in regarding this interest upon public deposits as a perquisite to which they were entitled, and the conflict of authority upon their right so to consider their retention of it, although, in my opinion, unauthorized by law, offers no ground for criticism in any degree of their integrity, either in their official or personal capacity. Judge Stockbridge, who had the benefit of the argument in the suit on the bond in the City Court where the main question which we have been considering was also involved, was kind enough to sit with me in this case, in view of its public importance; and I am gratified to be able to state that he authorizes me to say that he concurs in the general conclusions above expressed; and especially gratified that each of us reached those conclusions independently of any conference, and that upon conference they were confirmed.